BRISCOE, Chief Judge,
dissenting.
I respectfully dissent in this summary judgment case. I disagree with the majority’s conclusion that Heidtke failed to present sufficient evidence to satisfy the subjective component of the Farmer test, i.e., whether Sutton had a sufficiently culpable state of mind, Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Although it is a close question, in my view the evidence presented by Heidtke in response to Sutton’s motion for summary judgment was sufficient to create an issue of material fact regarding whether Sutton knew about and disregarded a substantial risk of serious harm to Heidtke. Accordingly, I would reverse the district court’s grant of summary judgment in favor of Sutton and remand the case to the district court for further proceedings.
I
Although the majority opinion provides a brief factual summary of Heidtke’s interactions with Sutton, it fails, in my view, to do so in a manner consistent with the standard of review that applies in summary judgment cases. More specifically, I believe that the majority opinion fails to recount the evidence in the light most favorable to Heidtke. Accordingly, I shall begin by doing so.
On June 2, 2008, Heidtke was an inmate at the Huerfano County Correctional Facility (HCCF) in Walsenburg, Colorado. App. at 217. On that date, Heidtke “[i]n-jured [his] right wrist playing softball.” Id. at 353. Heidtke was initially escorted to HCCF’s medical unit, and then transported to the emergency department at Spanish Peaks Regional Health Center in Walsenburg. Id. at 21. There, his right arm and wrist were x-rayed. Id. The x-ray revealed a “[mjinimally displaced transverse fracture [of the] distal right radius,” with a “[flracture line [that] m[ight] extend to the radiocarpal joint, dorsal medially.” Id. at 544. Dr. Rodney Lange, the emergency room physician who examined Heidtke, treated the injury by placing Heidtke’s right arm and wrist in a splint and sling. Id. at 21, 217. Lange also issued orders directing that Heidtke’s injured arm be elevated and packed in ice for the first few days after injury. Id. at 21. Lange opined the fracture would take three to eight weeks to heal. Id.
Defendant Jere Sutton is a physician licensed to practice medicine in Colorado. Id. at 218. Sutton practiced as an orthopedic surgeon until he elected, in 1988, to cease his surgical practice. Id. Thereafter, he practiced office orthopedics, including various stints as a temporary physician. Id. at 232. On May 30, 2008, Sutton contracted with CCA to work as a temporary general medical doctor at HCCF until a permanent replacement could be hired. Id. at 218, 486.
On June 4, 2008, two days after his injury, Heidtke was seen by Sutton in HCCF’s medical unit. Id. Sutton noted that there was “swe[l]ling of the hand and pain on palpation and movement.” Id. at 240. Sutton entered orders that the arm, which at the time was bound on a splint and in a sling, was to be considered for casting after the swelling decreased. Id. Sutton also ordered that Heidtke receive *286 Vicodin for pain, and ordered that a followup visit occur within “5 days for possible easting.” Id.
On June 6, 2008, when Heidtke appeared at HCCF’s medical unit to pick up his medication, he was noted to be out of his sling, with his arm dangling. Id. at 219. Heidtke was seen again in the medical unit the following day, June 7, 2008. Id. His hand was still swollen and he was given Tylenol for ongoing pain. Id. Three days later, on June 10, 2008, Heidtke returned to the medical unit and discussed with staff members the possibility of obtaining a “pass” that would allow him to wear his sling during trips to the mess hall. Id.
Heidtke was seen by Sutton for a second time on June 17, 2008 (approximately fifteen days after the injury). Id. at 241. Sutton observed that the “[fjingers and hand on the [injured arm] [we]re edema-tous — have good color and warmth [sic].” Id. An x-ray of Heidtke’s arm was taken and Sutton observed from the x-ray that the fracture “[a]ppear[ed] stable and slightly impacted with no angulation.” Id. Sutton noted, however, that Heidtke “complain[ed] of swelling and pain” and had been “[u]nable to sleep due to the pain.” Id. Sutton further noted that Heidtke “[h]a[d] been out of [his] sling at times.” Id. Sutton determined he could not cast the arm “at th[at] time due to the swelling,” and he “[d]iscussed [with Heidtke] means of improving and lessening the swelling.” Id. Sutton prescribed extra-strength Tylenol and a four-day-regimen of Vicodin and directed Heidtke to return for a follow-up visit in two weeks. Id.
Following his visit with Sutton on June 17, 2008, Heidtke completed and submitted to HCCF officials an inmate grievance form. Therein, Heidtke complained that the medical staff at HCCF had ignored his complaints of swelling and pain, and were deliberately indifferent to his medical needs. Id. at 474. The grievance was denied. Id.
On June 24, 2008, Heidtke completed and submitted to HCCF officials a written “REQUEST FOR SERVICE” form stating, “I realize that I finished my meds on the 22nd of this month, but the pain and swelling is still persisting, it is getting worse instead of better, if possible I would like to be seen again before my next scheduled x-ray.” Id. at 357. On that same date, a nurse in HCCF’s medical unit responded in writing, “You are scheduled to talk to the doctor.” Id.
On July 2, 2008, Heidtke completed and submitted another “REQUEST FOR SERVICE” form, this time stating:
I would like to be seen by the Doctor for my broken wrist. For 4 weeks I have been experiencing worsening pain and swelling in my hand/arm. I have lost almost all mobility in my thumb. I’m getting more and more tingling and numbing sensations in my 4 fingers, the pain that radiates from my thumb to my elbow is starting to border on excruciating. My thumb is terribly painful to the touch.
Id. at 358. Heidtke was seen later that same day by a nurse on duty in HCCF’s medical unit.. Id. at 242. The nurse noted that the “[s]kin on [the] fingers [of Heidtke’s right hand were] very tight and puffy.” Id. Heidtke advised her that “his fingers tingl[e]d much of the time,” and that he was “[u]nable to move [his] thumb and fingers without pain.” Id. The nurse “rewrapped” Heidtke’s arm with an “ACE wrap” and noted her observations in Heidtke’s medical records. Id.
Heidtke returned to the medical unit on July 5, 2008, complaining of arm and wrist pain. Id. at 243. The nurse who saw Heidtke observed that the splint and sling *287 were in place on his right arm. Id. The nurse provided Heidtke with a five-day regimen of acetaminophen and noted that he was scheduled to be seen by a physician later that week. Id.
On July 7, 2008, Heidtke was seen by Sutton for a third time. Id. at 244. Heidtke advised Sutton that he was experiencing swelling and pain in his right thumb and was unable to move it. Id. Sutton observed that Heidtke’s right hand and fingers “[we]re slightly swollen,” but had “[g]ood color and [we]re warm.” Id. Sutton “[r]emoved [the] outer ace wrap and reapplied [it] and allowed it to be less tight at [the] base of [the] thumb.” Id. Sutton also directed that Heidtke receive an x-ray of his right wrist, and he prescribed Heidtke a twenty-day regimen of Naprosyn for his pain. Id.
Following his appointment with Sutton on July 7, 2008, Heidtke completed and submitted to HCCF officials an inmate grievance form. The form stated, in pertinent part, “The medical staff is aware of my worsening condition, yet they do nothing but change the bandage on my arm and take me off the only medication that was allotted.” Id. at 475. Heidtke alleged that these acts constituted deliberate indifference. On July 9, 2008, HCCF officials wrote that “[t]here [wa]s no evidence to support [his] claim [of] insufficient treatment.” Id.
Approximately two weeks later, on July 22, 2008, Heidtke was seen in HCCF’s medical unit by a different physician, Dr. David Paz, who had been hired by CCA as a full-time employee and effective replacement for Sutton. Id. at 245, 414. Paz noted that Heidtke was “7% weeks post fall” and fracture and was “[s]till [experiencing] severe pain and inability due to pain to extend his thumb.” Id. at 245. Paz removed Heidtke’s splint and observed a “deformed dorsum of [Heidtke’s] right hand.” Id. Paz also observed “[g]ood pulses and neuro intact.” Id. Paz noted that “[p]ain in [Heidtke’s] snuff box [was] obvious,”[1] and that Heidtke was also experiencing “pain [in his] right elbow.” Id. Paz noted in Heidtke’s medical chart: “Need to rule out scaphoid fracture and fracture or dislocation of elbow and carpal bones. Ortho consult important and needed!” Id. Accordingly, Paz ordered an “[o]rthopedic consult ASAP,” as well as an “X-Ray (outside of this facility if necessary within next couple of days right hand, wrist, scaphoid view of wrist and right elbow for fracture/dislocationf) ].” Id. Paz also prescribed Heidtke pain medication “until [he was able to] see [] ortho surgeon.” Id.
Heidtke was examined by an orthopedic physician, Dr. Shawn Nakamura, on August 28, 2008. Id. at 24, 363. Nakamura noted that Heidtke had decreased range-of-motion “in all planes of the [right] wrist,” decreased “dorsiflexion,” “[r]adial and ulnar deviation,” “[p]ain with [range of motion] of the thumb,” and “[t]enderness throughout the wrist and hand.” Id. at 363. Nakamura concluded that Heidtke had suffered a right distal radius fracture, and “ha[d] elements of RSD,” id., i.e., Reflex Sympathetic Dystrophy (otherwise known as Complex Regional Pain Syndrome (CRPS)), id. at 346.[2] Nakamura *288 stated in his medical notes, “I’m ... getting a referral to Neurology and getting an MRI of the R[ight] wrist. Worried about tenderness to palpation of the snuff box.” Id.
In early 2009, Heidtke was seen by a neurologist, Dr. Sunku, who concluded, after running various tests, “that the results ... [we]re consistent with moderate carpal tunnel syndrome and that [Heidtke] possibly also had” RSD. Id. at 457. Later in 2009, after Heidtke was paroled to a halfway house and was responsible for his own medical care, “he was definitively diagnosed with RSD by a neurologist” at Denver Health Medical Center. Id. at 26. Heidtke was also seen by Dr. Timothy Muratore, an orthopedic doctor at the Denver Health Medical Center. Muratore made the following recommendations after examining Heidtke in late 2009:
At this point, due to the patient’s complex regional pain syndrome, he is unlikely to benefit from any surgical intervention at this point. In fact, he will most likely have worsening of the CRPS if there were to be any surgery performed in the near future. For that reason, we feel that the best course of action for the patient is to be sent to the pain clinic or anesthesiologist for potential sympathetic blockade of his right upper extremity. If we are able to obtain better control of the CRPS, he may be a candidate for wrist arthroscopy for diagnosis as well as debridement. However, at this point, the CRPS is uncontrolled and any surgery would cause a flare.
Id. at 365.
II
The majority opinion also fails, in my view, to recognize and give proper weight to the expert evidence presented by Heidtke in response to Sutton’s motion for summary judgment. That evidence, which Heidtke attached to his response to the other defendants’ motion for summary judgment and then incorporated by reference in his response to Sutton’s motion for summary judgment, provided as follows:
• Dr. Carlton Reckling. Reckling, an orthopedic surgeon retained by Heidtke as an expert witness, considered the steps taken by Sutton during each of his three visits with Heidtke. With respect to the June 4, 2008 visit, Reckling opined that Sutton failed to provide Heidtke with even the “minimal accepted treatment,” which Reckling described as a referral to an orthopedic surgeon for evaluation and possible surgery, and a follow-up evaluation by Sutton within five days. Id. at 486. Reckling further opined that Heidtke’s “clinical presentation” at the June 17, 2008 visit “[wa]s not ‘normal’ for a simple distal radius fracture,” and that the proper course of treatment was “referral to an orthopedic surgeon for evaluation and possible surgery.” Id. As for the July 7, 2008 visit, Reckling opined that Sutton failed to provide Heidtke with the “minimal accepted treatment,” which Reckling described as the removal of Heidtke’s splint and the *289 evaluation of Heidtke’s wrist and hand, new x-rays taken and compared to the first two sets of x-rays, evaluation of the x-rays by an orthopedic surgeon, and application of a “[n]ew well padded and well molded splint.” Id. at 437. “In summary,” Reck-ling opined that “when ... Sutton saw ... Heidtke on June 17 and on July 7, 2008, he should have known that there was a problem that required evaluation by an orthopedic surgeon, and he either should have acted in that capacity or referred ... Heidtke to an orthopedic surgeon for treatment.” Id. at 438. According to Reckling, “Sutton’s treatment of ... Heidtke’s fracture was the equivalent of no treatment.” Id.
• Dr. Jonathan Woodcock. Woodcock, a neurologist retained by Heidtke as an expert witness, opined that it was well-accepted that “the key symptom” of CRPS was “continuous, intense pain out of proportion to the severity of the injury, which gets worse rather than better over time,” id. at 441 (internal quotation marks omitted), and he noted that “[wjithin two weeks of ... Heidtke’s fracture on 6/2/08, he was exhibiting this symptom coupled with edema, another key symptom” of CRPS, id., “both of which worsened over time,” id. Woodcock further opined that “[wjhenever this occurs following peripheral injury, particularly a radial fracture, the pain must be investigated thoroughly and steps taken to ensure that CRPS does not develop.” Id. “In other words,” he opined, “early, persistent, severe pain must be taken seriously ... because ... without early intervention ] it may develop into CRPS.” Id. (emphasis in original).
Woodcock noted that in this case “Heidtke’s early symptoms of severe pain and swelling were worsening when they would have been expected to be improving,” id. at 446, yet “Sutton left ... Heidtke in a sugar tong splint,” id. at 445-46, for “seven weeks,” id. at 445, causing “his fracture [to] heal[ ] in a malunion and his CRPS [to] worsen[ ],” id. at 446. And, Woodcock opined, “[h]ad ... Heidtke been referred to an orthopedic surgeon within at most several weeks of the time it had become clear that his recovery course was considerably atypical, it is more likely than not he would have received appropriate, and surely more aggressive treatment, and that he would have experienced either a considerably more benign course or a full recovery.” Id. Woodcock effectively agreed with Reckling by opining that “[i]n the absence of [a] referral” to an orthopedic surgeon for evaluation, “Heidtke did not receive treatment for his developing CRPS under ... Sutton’s care.” Id. at 447.
• Dr. Lynn Sander. Sander, a board certified internist retained by Heidtke, opined that “Heidtke’s complaints were consistent with known complications of a radial fracture which include fracture of the scaphoid bone, disabling arthritis, carpal tunnel syndrome, radial shortening and angulation deformity which limit range of motion, chronic pain, non-union and reflex sympathetic dystrophy (RSD).” Id. at 454. She further opined that “Sutton’s lack of treatment” in light of these symptoms “was especially egregious because he knew of the risk of serious complications of radial fracture by virtue of his [orthopedic] training, yet he did not take any action to mitigate the risk on multiple occasions.” Id. Like Heidtke’s other two experts, Sander opined that, “[i]n essence,” Heidtke “received no medical treatment for his injury for 7.5 weeks until there was a change in providers.” Id.
Ill
Construing all of this evidence in the light most favorable to Heidtke, I am persuaded that reasonable jurors could have found that Sutton was “aware of facts from which the inference could be drawn that a *290 substantial risk of serious harm exist[ed].” Farmer, 511 U.S. at 837, 114 S.Ct. 1970. In particular, Sutton (a) reviewed the medical records and x-rays from Heidtke’s visit to the Spanish Peaks emergency room, which clearly suggested the possibility of a complex fracture extending into Heidtke’s wrist joint, (b) reviewed Heidtke’s medical records at HCCF, which included notations of Heidtke’s complaints to the nursing staff of increasing pain, swelling, and lack of mobility in his right wrist and hand, (c) personally met with and evaluated Heidtke on three occasions during June and July 2008, during which he not only observed Heidtke’s wrist and hand, but also heard directly from Heidtke regarding his symptoms, and (d) obtained and reviewed an additional x-ray of Heidtke’s wrist and hand on June 17, 2008. In short, Sutton was well aware that, following Heidtke’s initial injury, Heidtke’s symptoms continued to worsen, rather than improve.
In turn, I am persuaded that the evidence, again construed in the light most favorable to Heidtke, was sufficient to allow a jury to reasonably find that “the need for additional treatment or referral to a medical specialist,” i.e., an orthopedic surgeon, was “obvious.” Self v. Crum, 439 F.3d 1227, 1232 (10th Cir.2006). All three of Heidtke’s expert witnesses testified that Heidtke’s steadily worsening pain and swelling established an obvious and urgent need for Heidtke to be referred for evaluation and possible surgery by an orthopedic surgeon, yet Sutton not only failed to do so, but effectively did nothing to address Heidtke’s symptoms over the course of three visits spanning seven-and-a-half weeks.[3]
Based upon this expert witness testimony, a jury could reasonably find that Sutton, in effect, completely denied care to Heidtke, at least at the time of the third and final appointment on July 7, 2008. See id. at 1232 (noting that obviousness can arise where a medical professional completely denies care in the face of recognizable and serious symptoms). Alternatively, a jury could reasonably find that Heidtke’s steadily worsening symptoms were so “glaringly obvious to a medical professional that recklessness may be inferred,” Maj. Op. at 283. In other words, a jury could reasonably find, based upon the evidence presented by Heidtke, that Sutton exhibited “an extraordinary degree of neglect” by failing to refer Heidtke to an outside specialist for evaluation and possible treatment, particularly by the time of the third appointment on July 7, 2008. Self, 439 F.3d at 1232. Thus, in my view, a jury could reasonably find that Sutton satisfied the subjective component of the Farmer test.
In concluding that Heidtke failed to present sufficient evidence of obviousness, the majority focuses most of its attention on the question of whether “the malunion and onset of CEPS in this case were ... so obvious that even a layman would recognize the conditions.” Maj. Op. at 282. But Heidtke has never relied on this “obvious to a layman” standard. Instead, he argues that, under the circumstances of this case, the proper “measure of a reasonable man” is a trained “physician, rather than a lay person with no medical train *291 ing.” Id. Although the majority concedes that “at times a doctor may be reckless by failing to detect what should be glaringly obvious to any medical professional,” id. at 283, it summarily concludes, without any mention of Heidtke’s expert witness testimony, that Heidtke cannot prevail even under this standard. As I have explained, however, all three of Heidtke’s expert witnesses agreed that, based upon the symptoms presented by Heidtke and clearly observed by Sutton, the need for referral to a specialist or additional treatment would have been obvious to any medical professional. In light of this unusually strong expert witness testimony, I believe it is quite clear that Heidtke presented sufficient evidence to survive Sutton’s motion for summary judgment, and that the district court erred in concluding otherwise.

. "The anatomical snuffbox is a triangular deepening on the radial, dorsal aspect of the hand- — at the level of the carpal bones, specifically, the scaphoid and trapezium bones forming the floor. The name originates from the use of this surface for placing and then sniffing powdered tobacco, or 'snuff.' " Wikipedia, Snuff Box, at http://en.wikipedia.org/ wiki/Anatomical_snuff_box.

. CRPS "is a chronic pain syndrome most often resulting from trauma to a single extremity.” Oldham v. Astrue, 509 F.3d 1254, 1255 n. 1 (10th Cir.2007) (internal quotation *288 marks omitted). "The most common acute clinical manifestations [of CRPS] include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone.” Id. "[T]he degree of pain reported is [characteristically] out of proportion to the severity of the injury sustained,” and, ”[w]hen left untreated, the signs and symptoms of the disorder may worsen over time.” Id. Notably, "[a] diagnosis of RSD is based upon complaints of persistent, intense pain that results in impaired mobility of the affected region, coupled with other complaints....” Id. (internal quotation marks omitted).

. Had Sutton not seen Heidtke on the last occasion, my determination may have been different. In other words, I am not persuaded that a jury could reasonably find that Sutton was deliberately indifferent based solely on the steps he took with Sutton during the first and second appointments on June 4 and 17, 2008. But, in my view, it is particularly egregious that, at time of the third appointment on July 7, 2008, when Heidtke’s symptoms were clearly worsening rather than improving, Sutton continued to take no serious steps to either determine the precise cause of the problem, or to alleviate Heidtke’s symptoms.